## In re RISCH.

*(District Court, E. D. Texas. 1888.)*

**1. EXTRADITION—INTERNATIONAL—EVIDENCE OF CRIME.**
Under the treaty between the governments of the Germanic confederation and the United States, made in the year 1852, providing for the extradition of criminals, which stipulates for the delivery of persons charged with crime upon such evidence of criminality as, according to the laws of the place where the fugitive is found, would justify his apprehension and commitment for trial, if the crime had there been committed, it is sufficient that a *prima facie* case be made, such as, in the absence of explanation, would justify conviction, or such evidence as, in case of trial and conviction thereon, would sustain the verdict.

**2. SAME—HOMICIDE—MURDER.**
Upon application for the extradition of prisoner as a fugitive from Germany, charged with murder, it was proved that prisoner was a near neighbor of deceased, knowing his financial condition; that deceased was on the day prior to his disappearance engaged in moving his property to prisoner's house, to leave it in his charge during an intended journey, and to prevent seizure by creditors; that he was last seen in the night at prisoner's house with him and his sons; that a servant sleeping in the house was awakened by sounds indicating the use of violence to, and the distress of, a human being; that there were opportunities for the removal of the body from the house to a forest, where, eight months after, it was found, bearing indubitable marks of death by violence, and that such death occurred about the date of disappearance; that property of deceased known to have been in prisoner's possession never was accounted for; that deceased had a considerable sum of money, which there was evidence to indicate was in prisoner's possession; and that, in a few days after deceased's disappearance, prisoner unexpectedly left for America, where he purchased a home, spending money, but not as much as he was supposed to have obtained from deceased, living frugally with his family, bearing a good reputation, but going under an assumed name, until his ar-

rest. *Held,* that under the treaty with Germany of 1852, and statutes of the United States concerning extradition, the evidence was sufficient to hold the prisoner for delivery to the German authorities.

At Law. Application for extradition of Ludwig Risch, *alias* Ludwig Rischkee, or Ludwig Rischky.

*M. E. Kleberg,* for the German Empire. *Burns & Burns,* for defendant.

SABIN, J. The defendant and one Louis Risch, *alias* Rischkee, or Rischky, are charged with the murder of Franz Schmalinsky, alleged to have been committed by them on the 23d day of April, A. D. 1883, at Griesel, in the district of Crossen, in the kingdom of Prussia, in the empire of Germany, to which he has pleaded not guilty; and his extradition is sought for the trial thereof under the treaties of 1852 between the United States and Prussia and other states of the Germanic confederation, and in pursuance of the laws of the United States for extradition.

The first question presented for my decision is as to whether a person may be extradited upon a *prima facie* showing; and it is claimed that the presumption of law as to a man's innocence is a stand-off as against a *prima facie* showing of guilt. This might be so, and would probably be so acted on, where the *prima facie* showing was light; but when the evidence not only creates the presumption of guilt, but creates such a volume of strength, from the evidence, of the guilt of the party charged that it would seem unreasonable to suppose such party innocent, then, in such case, it would seem the plain duty of the magistrate to make the order for holding for extradition. The treaty provides for extradition "upon such evidence of criminality, as, according to the laws of the place where the fugitive is found, would justify his apprehension and commitment for trial, if the crime had there been committed." And, further, that "if on such hearing the evidence be deemed sufficient to sustain the charge, it shall be the duty of the examining judge or magistrate to certify the same to the proper executive authority." I take it that this latter clause requires the judge to be satisfied that the evidence before him is sufficient to sustain the charge were the same on trial before him. If a verdict of guilty were rendered upon the evidence, would he feel it his duty to set it aside? That seems to me to be the reasonable rule. In other words, the evidence should be such as to fairly prove the charge, and call upon the defendant to explain the facts adduced, and without which explanation the charge would stand proven. I think that is the rule by which I should be governed in the decision of this case.

In 1883 there were three mills on the Griesel river, in the kingdom of Prussia, known as the "upper mill," the "middle mill," and the "lower" or "back mill." The defendant was the proprietor of the middle mill, and afterwards his son, Louis Risch; while the deceased was the proprietor of the lower or back mill. These mills were in a thickly-settled country, and near which were several villages and good-sized towns, and near there was a forest on the Bentnitz road, known as a "fir preserve." It

was for the growth and preservation of these trees.    Franz Schmalinsky, the deceased, on and prior to April 22, 1883, was an industrious and enterprising miller, and at times thrifty, and enjoyed the confidence of those with whom he dealt to a considerable extent; but in the spring of that year he became embarrassed to a great extent, and availed himself of the confidence he enjoyed to obtain money, as alleged, by forgeries; and also by converting many of his available assets into money, and unquestionably had in hand from $1,600 to $3,000, probably in the neighborhood of $2,500; but as his creditors would soon likely be upon him with writs, and as the supposed forgeries might soon come to light, he took one further step of transferring all his available means, household furniture, cattle, horses, buggies, and hay to the defendant, and, with the exception of a load or so of hay, the whole of those things were removed to the house and mill of the defendant, as early as April 22, 1883, in which both parties took part, and engaged in the transfer and removal with an energy that showed that time was an important element of the transaction in hand.    The 22d was on Sunday.    Among the things so removed was a large-sized fir wardrobe, capable of holding a man inclosed therein; and when it was moved over to defendant's, a distance of about three-quarters of a mile or less, one witness says it was full of clothes, and another that it contained all of the best clothes of the deceased.    That the deceased contemplated a movement of some kind is evident, not only from these facts, but from the fact that he had frequently announced his intention of going to Poland to buy cattle.    He had made such trips several times before in previous years.

In the afternoon of the 22d he sent his servant, with his money satchel, to defendant, informing his servant that it contained money, and to deliver it to defendant, which she did, but whether it contained any money or not was unknown to witness.    Some time early in April the defendant recalled from service in a neighboring place one of his daughters, with the view of keeping house for his son Louis, at the mill, and in whose name the mill property stood.    She reached home April 3, 1883, and some seven days prior to April 23, 1883, that being the day of the tragedy, defendant engaged tickets for himself, wife, and four children, one of them, his ward, being also a child by adoption, he paying say $20 thereon by way of earnest money to secure the tickets, the vessel being to sail about the 29th or 30th of April, whereupon the ticket agent, as was his duty, gave notice of such transaction to the local police.    The defendant left his home for the steamer on the 29th of April, 1883, and for America, with all of his family above stated, leaving only his son Louis and a daughter remaining at the mill, which stood in the name of Louis, who had recently returned from a three-years service in the army.    The defendant and the five members of his family arrived in America in due course, reaching San Antonio, Tex., from New York, by rail, where he bought a lot shortly after his arrival, paying $200 down and the balance of $300 on time, and erected by himself a small shed-house, and afterwards, by arrangement with a building association, a larger and more comfortable dwelling, in all, however, not exceeding in

present value the sum of from $1,500 to $2,500 for lot and improvements. His life has been frugal, and he has maintained good habits, and is well esteemed by all who know him in San Antonio, Tex. His name in Germany was Ludwig Risch, and he was so known. On coming to America he claims an additional given name, "Martin." He also changed his name from "Risch" to "Rischki," and signs his name "M. Ludwig Rischki." Since here he has been overwhelmed by misfortune in the loss by death in 1883 of his son Otto, and afterwards by the death of his wife, and also of his daughter Anna. In October, 1883, his daughter left by him at the mill left for America, and joined him at San Antonio, and afterwards his son Louis did likewise, his daughter, however, coming first, and alone. His daughters went at once to service, and have contributed to his aid in living and acquiring the homestead; and such was the case up to the time of the arrest herein, on which day the one last arriving here was to have been married. The property of Schmalinsky, moved over to defendant's mill, was left there by defendant, in the hands of his son Louis, and was mostly taken back by Mrs. Schmalinsky or redelivered to her. There was one notable exception, however, and that was the clothes of Schmalinsky. When the wardrobe came back through the aid of her former guardian, it was empty of clothing.

It is time now to go back to the mill, and review the tragic occurrences of the 23d of April, and those connected therewith. The middle mill, defendant's residence, was a large stone building, with one roof covering the mill and the dwelling. It was two stories, with a hall in the center above, which was reached from below in front by means of steps. On the left side of the hall, in the upper story, was the residence of defendant, with a door entering from the hall into the sitting-room, behind which was the sleeping-room and a pantry. On the right-hand side of the hall was the mill used for grinding grains and all the business incident to the mill. Over all this was a garret, where persons engaged in the mill sometimes slept. The door on the right-hand side entered into the mill, while that on the left entered into the sitting-room. Below the mill, hall, and residence portion, or on the lower floor, was a kitchen, and what was called a "mill-room," used for grinding linseed, and making oil, wherein also was an oven, and it was also used for a sleeping-room for defendant's sons Louis and Otto, and claimed by the witness Brunzel to have been the place where he slept. On Sunday, April 22, 1883, everything was made lively at the lower mill and at the middle mill by the parties and their servants in moving Schmalinsky's things and chattels to the middle mill. The defendant and his servant, August Brunzel, as well as several members of defendant's family, were busy in hauling or receiving things. In the night of that day, say 10 P. M., the deceased was seen by his wife for the last time, in her bedroom, and in the presence of defendant, and no mention of any immediate departure was spoken of. Later on the last load was hauled that night, and there was attached to the load or wagon the buggy of the deceased, to be hauled to the defendant's mill; and while so proceeding, Brun-

zel driving, the deceased was seen by Brunzel walking behind and talking with defendant about the sale of his things to him, but was missed by Brunzel about the time they reached a point of the road near the fir preserve. Brunzel, Risch, and his son Louis or Otto—witness cannot state which—proceeded on to the house of defendant, where the horses were unhitched, Risch directing them to be fed, and informing Brunzel that they would have to start early again in the morning, at 3 A. M., in order to get another load of hay, so as to get in ahead of others, the creditors of deceased; after which the defendant, Risch, went into his sitting-room. There was a light burning. It was usual to burn a light all night in that room. Just after the horses were unhitched, Brunzel saw a man coming across the meadow from the direction of the Schmalinsky mill towards the rear of the house of defendant, and witness stopped and looked and soon saw the deceased come up, who accosted him, and went on up into the mill by the back stairs, towards the dwelling of Risch. Defendant and several members of his family had been in the sitting-room a few moments before. This was about 1 A. M., and was the last ever seen of deceased alive on this earth. Brunzel went into his sleeping place under the house to bed, and went to sleep for a half hour, or perhaps an hour, when he was awakened by noises overhead as if the moving of furniture, and the stepping of men with boots on, and the gargling or rattling sound as if of some one in the last gasps of death; but after a little he went to sleep again until he was awakened in the morning about 4 A. M. by defendant, who claimed to have overslept himself, when they went to the lower or back mill for another load of hay, and found others already there on the same mission, but the deceased was missing, and defendant informed witness that deceased had gone to Poland to buy cattle. But on the next day, and afterwards, defendant claimed, not only to Brunzel, but to others, that deceased had gone to America, and would never come back; and also stated to some one that he was a bad man to have left his wife in that way. It was generally supposed and believed that deceased had gone to America until January 31, 1884, when his body was found in a thicket of the "fir preserve" in the rear of his former residence and mill, dead, and his body in such a state of decay as was consistent with the time of his disappearance and finding,—his head off, four front teeth out of the upper jaw, also corner tooth, without watch or ring or other valuable, and in his ordinary miller's clothes, such as he wore in life. His skull had been fractured, and bore the impress of a heavy blow by some hard instrument, which left a blood-stain in the bone of the skull, showing that the blow had been struck while he was in life, and of a character that would have caused death. Now who did it? His life was gone, his money was gone, and his clothes were gone. Who took them away? He was last seen in the very early morning entering defendant's mill, in which defendant then was. The defendant was in possession of his money satchel; what became of it? The wardrobe contained all his clothing; what became of them? Can the mind lead up to any other conclusion than that he was killed at defendant's mill by his aid and as-

sistance, at least, on the morning of the 23d of April, 1883? My mind is led to that conclusion. And I might stop here and close, but there are many other facts in evidence that, while they have relevancy to the foregoing, yet they relate more to theories of how the body was removed than fully proving that it was done in any given way.

It is sufficient for the purposes of this investigation that the evidence shows that the body or person of the deceased was removed from defendant's house, and that defendant and his confederates, one or more, had ample means and opportunity for so removing it. The defendant had the team and buggy of the deceased, as well as his own, with which he could have removed him or it, between the time when Brunzel heard the noise and gargling sounds and when he was called at 4 in the morning. Again, it was possible that the deceased was stuffed in the wardrobe with his clothes, and taken off in that on the 24th or 25th. The testimony on that subject is that on the 24th or 25th defendant ordered Brunzel and his son Louis to help load the wardrobe upon a wagon, and that Brunzel remarked that it was very heavy, and that defendant replied that it was certainly heavy; that defendant said he was going to take it to Bentnitz, to some one to whom he had sold or was going to sell it, and that defendant and Louis drove off with it on that road, which would be the proper one to take to reach the place where the body was finally deposited, as well as the one which led to Bentnitz; and that, after a brief period, but long enough for them to have gone to Bentnitz and return, they returned with the wardrobe, and, by the aid of the witness, returned it to the place where it had formerly stood in the sitting-room; that Brunzel noticed that it was still heavy, but whether lighter than before he could not state. While this shows that the body might have been so moved, yet it does not prove that it was so moved. The wardrobe was locked when moved. Whether it was locked when brought to the defendant, is not shown. When returned to Mrs. Schmalinsky, it was empty. I might allude to the fact that defendant exhibited a large amount of money in the presence of Mrs. Ernestine Deckert, and of his son Louis, as she believes, before leaving for America, which, while it shows that he had money, yet its exhibition openly would perhaps indicate innocence, rather than guilt. As to the stenches smelled in the house about the 8th of May, they indicate nothing as to the body; and if they relate to the burning of the clothes,—of which there is no evidence,—they are too remote and indefinite, and so also of the blood-stains found in the house.

The only solid facts with which I have to deal are that just prior to the killing defendant was acquainted with the financial condition and embarrassments of the deceased, and aided him therein; that deceased came to defendant's mill, after midnight, and in the early morning of April 23, 1883; that defendant was there, also some members of his family; that shortly thereafter unusual noises were heard in the residence portion of defendant's dwelling, as of moving of furniture, the stepping of men with boots on, and the gargling sounds as of some one in the gasps of death; that deceased disappeared, and was no more heard of

until his body was found January 31, 1884, in a "fir preserve" situated without, but to the rear of, the mill of the deceased, and in a state of decomposition consistent with the length of time of its disappearance and surroundings; that on the morning of the disappearance, and before the awakening of Brunzel by defendant, defendant had ample time and means to remove the body to the "fir preserve," where it was found; that defendant had possession of the money satchel of deceased, and also of all his clothing contained in the wardrobe; that deceased had considerable money on hand, whether in his satchel or elsewhere; that the clothing, satchel, and money have not been heard of since the disappearance of the deceased, and that deceased was found dead as the result of a heavy blow on the skull; that his body was identified; that defendant had taken steps to remove to America shortly previous to the murder; that on the occasion of the murder he was aided by one or more co-principals; that defendant left for America quietly, and that his leaving was not generally known; that it was in the nature of a sudden disappearance; that he had money to reach San Antonio, Tex., and pay $200 on land; that defendant was seen with a considerable amount of money shortly before he left, exhibited by him to Mrs. Ernestine Decker, in presence of his wife, and against his wife's remonstrances, and in the presence also of his son Louis, as Mrs. Decker believes.    I might state here that I have not disregarded the attempted contradiction of the witness Brunzel as to his sleeping-place; but whether he had a sleeping-place at the stable, or one which might have been used as such, yet I am satisfied that, as his evidence is supported in so many different instances by other witnesses upon different subjects, as well as by the certificate of the judge, together with the explanation of the witness as to the little importance attached by him at the time to the noises heard by him, and to his fear of being suspected himself, that I am inclined to, and have given entire credence to, his statements.

Without referring to the numerous other matters presented by the evidence, I am convinced that the evidence is sufficient to sustain the charge made against the defendant herein, Ludwig Rische, *alias* Rischkee, or Rischky, by Julius Runge, consul for the German empire, that said Risch, *alias* Rischkee, or Rischky, had committed the crime of murder of and upon one Franz Schmalinsky, on the 23d day of April, 1883, at Griesel, in the district of Crossen, in the kingdom of Prussia, in the empire of Germany, and within their jurisdiction and government, and deem the same amply adequate and sufficient to sustain the said charge under the provisions of the treaty between the United States of America and Prussia, and of other German states, parties thereto, of date June 16, 1852, and of that of November 16, 1852, and that Prussia is now a part of the German empire; and I therefore order and adjudge, and it is ordered and adjudged by me, that the said Ludwig Risch, *alias* Rischkee, or Rischky, be held in custody by the marshal of the United States of America for the Eastern district of Texas, and confined in the county jail of Galveston county, Tex., for extradition, in accordance with said treaties and the laws of the United States, as contained in the Revised Statutes of the

United States, tit. 66, "Extradition," pp. 1021–1023, and that a warrant issue to carry this order into effect; and that the evidence, or a copy thereof, be immediately, or as soon as may be, transmitted to the secretary of state of the United States, to the end that such action may be had by him in the premises as justice may require. And it is so ordered.